UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| PSI SYSTEMS, INC. D/B/A ENDICIA, | § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No.: 1:14-cv-750-LY |
| AUCTANE L.L.C. D/B/A SHIPSTATION, | § § | |
| Defendant. | § § | |

**PLAINTIFF'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS
APPLICATION FOR PRELIMINARY INJUNCTION**

For the past three years, Auctane LLC d/b/a ShipStation ("Auctane" or "ShipStation") and PSI Systems, Inc. d/b/a Endicia ("Endicia") together have built a base of over 3,600 customers. Customers used ShipStation to automate their postage order fulfillment and used the Endicia Label Server ("ELS") to print USPS shipping labels.

On July 23, 2014, ShipStation unilaterally switched these 3,600-plus customers from its three-year contracting partner, Endicia, to ShipStation's new parent company (and Endicia's only direct competitor for this type of service), Stamps.com Inc. ("Stamps"). ShipStation did not tell Endicia it was going to make this switch. Nor did ShipStation inform these 3,600-plus customers. Instead, contrary to express representations made by ShipStation to Endicia days before, ShipStation executives secretly diverted these customers to Stamps following Stamps' $50 million purchase of ShipStation — an acquisition that provided ShipStation's executives a substantial financial incentive to move customers to Stamps.

ShipStation's actions breached the parties' contract, violated ShipStation's obligation of good faith and fair dealing, and contravened the parties' consistent three-year course of dealing. ShipStation's unilateral theft of customers must be enjoined and the parties' restored to their pre-

July 23, 2014, position.  Otherwise, Endicia will continue to suffer irreparable harm.

## FACTUAL BACKGROUND

### I. The 2011 Agreement

On July 26, 2011, Endicia entered into an agreement with Auctane in which Endicia licensed its proprietary ELS service to Auctane.  *See* 2011 Agreement, attached as Ex. A.  The 2011 Agreement defined "Customer" as someone who uses the ELS, as made available to that person through a software provider (such as Auctane), to print their own USPS shipping labels with appropriate postage.  *Id.* at Recital A, 1.3.  In the 2011 Agreement, Endicia granted Auctane a non-exclusive, non-transferable license to the ELS for Customers to use to print shipping labels using the ELS, in exchange for certain service fees, and subject to certain volume-based rebates.  *Id.*

### II. The Launch of ShipStation by Auctane

Capitalizing on the relationship created by the 2011 Agreement, Auctane announced the launch of ShipStation, "a New Multi-Channel, Multi-Platform Shipping Solution for E-Commerce Sellers." Press Release, attached as Ex. B. Importantly, the press release touted, "Each ShipStation subscription includes a free DYMO Endicia account, which allows users to print all classes of USPS postage. ShipStation also integrates with Express 1, a government partner of the US Postal Service, providing discounted rates on USPS Priority and Express Mail." *Id.*

Starting in October, 2011, the parties followed a course of conduct whereby a customer would obtain a ShipStation subscription and receive a free Endicia account, allowing the customer to print labels on its own computer using ELS.  For USPS First Class mail, customers used their Endicia accounts to print labels.  For USPS Priority or Express Mail, customers were offered discounts available from Express 1, a company who, pursuant to a relationship it has

- 2 -

with the USPS, can offer discounted Priority and Express Mail postage rates. Such customers use ELS to print their USPS postage labels.

Under this arrangement, that customer paid ShipStation a subscription fee, thus becoming a ShipStation customer. The customer also paid Express 1 for the postage it bought when it chose Express 1 to get discounted pricing, thereby becoming an Express 1 customer. Finally, the customer used the Endicia ELS service to print its postage, thus becoming an Endicia customer. J. Colby Clark Dep. at 26-27, excerpts attached as Ex. C. To assist the Court in understanding how this course of dealing worked, a diagram is attached as Exhibit D, which provides an overview of the parties' dealings under the 2011 Agreement. Under this course of dealing, ShipStation, Express 1, and Endicia built a base of over 3,600 customers. Year over year, this relationship produced growth in excess of 100%. Clark Dep. at 31, Ex. C.

### III.    The 2013 Agreement

In February 2013, Nathan Jones was hired as the CEO of Auctane. Nathan Jones Dep. at 35, excerpts attached as Ex. E. One of Mr. Jones' tasks in 2013 was to negotiate a new agreement with Endicia to apply to the existing business described above. The new agreement sought to extend the term of the 2011 Agreement an additional three years, so that the parties could continue to grow the successful business they had built. On July 26, 2013, Rick Hernandez of Endicia sent Mr. Jones an "Auctane ELS Agreement-2013-for review.docx" which contained many of the same terms that existed in the 2011 Agreement. E-Mail from Rick Hernandez, attached as Ex. F. Most importantly, the definition of "Customer" remained unchanged. *Id.* at Recital A, Sec. 1.3. Mr. Hernandez also proposed expanding the exclusivity provision in Section 5.5 from the 2011 Agreement to include Stamps. *Id.* at Sec. 5.5. Last, Mr. Hernandez proposed making the non-solicitation provision in Section 7.7 reciprocal, so that in addition to Endicia being prohibited from soliciting Customers of Auctane, Auctane also would

be prohibited from soliciting Customers of Endicia. *Id.* at Sec. 7.7.

Auctane's biggest issue with the proposed new agreement was the exclusivity provision. Email from Jason Hodges, attached as Ex. G. Ultimately, Section 5.5 was removed from the agreement executed in November, 2013. *See,* 2013 Agreement, attached as Ex. H. However, the reciprocity of Section 7.7 remained in the Agreement. Mr. Hernandez specifically noted to Mr. Jones during their negotiations, and as reflected in a draft Mr. Hernandez sent to Mr. Jones on October 30, 2013, a need to discuss "flipping" accounts without a breach of agreement. Email from Rick Hernandez at Endicia_001002, attached as Ex. I. Mr. Hernandez made clear to Mr. Jones that "flipping" any existing Endicia accounts would be a breach of Section 7.7's non-solicitation provision. Rick Hernandez Dep. at 95, 129, excerpts attached as Ex. J. The 2013 Agreement is the version currently in effect.

### IV.  The Stamps Acquisition of Auctane

Beginning sometime in 2013, Auctane and Stamps began secret discussions about an acquisition. Jones Dep. at 107, attached as Ex. E. By April 28, 2014, Ken McBride, the CEO of Stamps, sketched out to Auctane executives a strategy in which customers of Endicia would be migrated to Stamps. *See,* Ex. K. In fact, the purchase of ShipStation by Stamps was structured so that top level Auctane executives would earn up to 768,900 shares of Stamps stock depending on the migration of Endicia customers to Stamps went. Jones Dep. at 105, 110, attached as Ex. E; Hodges Dep. at 127, excerpts attached as Ex. L. On June 16, 2014, Stamps publicly announced its acquisition of Auctane, including ShipStation.

### V.  Executing the "Switch"

In order to implement their scheme to switch Endicia's customers to Stamps, Auctane needed Express 1 to activate additional postage "meters" with Stamps. On June 17, 2014, Mr. Hodges wrote to Colby Clark, the President and Managing Director of Express 1, telling him that

Auctane was preparing for a scenario whereby Endicia might try to move customers using Endicia's ELS service to a different shipping platform (*i.e*, away from ShipStation and Express 1).  *See,* Ex. M.  ShipStation executives repeatedly told Mr. Clark that the meters would only be used if Endicia actually implemented this scenario. Clark Dep. at 48, 51, attached as Ex. C.  Ultimately, Endicia never made such a move.  *Id.* at 53-54.  In fact, the only persons contriving such a scenario were Messrs. Jones and Hodges.  *Id.*

Auctane also wanted to make sure that once customers were switched from Endicia to Stamps, Auctane would capture the royalties Express 1 was paying Endicia.  Under the terms of Express 1's agreements with Endicia, Express 1 paid a royalty on each label printed using the ELS service.  *Id.* at 28.  In early June, 2014, Auctane asked Express 1 to agree that, for any postage printed through Express 1 using a Stamps postage meter after July 1, 2014, Express 1 would pay Auctane the same royalty that it had been paying Endicia.  *Id.* at 48, 51, 53, 63.  On June 25, 2014, Express 1 agreed to this amendment.  *Id.*  At that time, Express 1's expectation was that existing Endicia customers would be left alone, and would continue to print labels using Endicia's ELS service.  *Id.*

Neither the additional 20 meters created by Stamps nor the change in the royalty payment between Express 1 and Auctane was ever communicated to Endicia.  In fact, after the Stamps / Auctane acquisition, Endicia's Mr. Hernandez specifically asked Mr. Jones whether Auctane intended to switch Endicia customers to Stamps, based on what he was hearing from Endicia account representatives regarding Stamps' salespersons activities.  In response to Mr. Hernandez' inquiry, on June 25, 2014, Mr. Jones emailed Mr. Hernandez and assured him that "nothing has changed on our end with regards to Endicia and existing accounts within ShipStation."  *See,* Ex. N.  The next morning (June 26), Mr. Hernandez wrote back to Mr. Jones

thanking him for his assurances, and indicating that nothing had changed on Endicia's side. *Id.* On the same day, however, in an email exchange between Mr. Jones and Mr. McBride (Stamps' CEO), the two discussed moving *all* customers who were currently using ELS through Express 1 to Stamps to print their postage labels. *See,* Ex. O. *See also,* Ex. P, (targeting an initial group of Endicia customers so as to not alarm Endicia).

On the night of July 23, 2014, ShipStation unilaterally began migrating customers who had for three years been printing Endicia labels using Endicia's ELS to Stamps. *See,* Ex. Q. ShipStation did so without notifying Endicia, Express 1, or any of the customers whom it switched from Endicia to Stamps. Clark Dep. at 83, 85, Ex. C. When Mr. Hernandez looked at the daily report of customers printing postage through Express 1 on July 24, he was startled to see that only a handful of Endicia's customers still appeared there, whereas the day before, there were over 3,600 such customers listed. Endicia could no longer view these customers as it had been able to for almost three years since the launch of this business relationship. At that point, Endicia had no means through which to contact its customers to explain to them what had happened.

The void left by Endicia's inability to communicate with its customers, who had grown accustomed to always printing Endicia labels, was filled by Auctane. As the inquiries from these customers began rolling in after Auctane made the switch, Auctane seized the opportunity to release its own message to these customers, without any input or involvement from Endicia. *See,* Ex. R. Based on Auctane's internal records, some customers were dissatisfied with the switch from Endicia to Stamps, noting that they were not notified of the change, and wanted to be switched back to Endicia. *See,* Ex. S (Group Exhibit).

## LEGAL STANDARD

"The purpose of a preliminary injunction is to preserve the status quo and thus prevent

irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits." *Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 560 (5th Cir. 1971). Importantly, the plaintiff is not required to prove his case in full at a preliminary injunction hearing. *H & W Indus., Inc. v. Formosa Plastics Corp.*, 860 F.2d 172, 179 (5th Cir. 1988). A preliminary injunction should be granted where the plaintiff shows: "(1) there is a substantial likelihood of success on the merits; (2) there is a substantial threat that the movant will suffer irreparable injury if the injunction is not issued; (3) the threatened injury to the movant outweighs any damage the injunction might cause to the opponent; and (4) the injunction will not disserve the public interest." *Id*. Every factor weighs heavily in favor of granting Endicia's application for preliminary injunction.

## ARGUMENT

### I.      Endicia Has a Substantial Likelihood of Succeeding on the Merits.

#### A.      Endicia Is Likely to Succeed on Its Breach of Contract Claims.

To prove a breach of contract claim under Delaware law, Endicia must show that (1) the agreement is enforceable, (2) ShipStation materially breached the agreement, and (3) Endicia suffered damages as a result of the breach.[1] *Hough Assocs., Inc. v. Hill*, 2007 WL 148751, at *14 (Del. Ch. Jan. 17, 2007) (citation omitted). There is no question that the Agreement is enforceable and prohibits solicitation of Endicia's customers in Section 7.7. Endicia is substantially likely to prevail because even the limited discovery taken by the parties already establishes that ShipStation has materially breached its contractual obligations and Endicia has suffered and continues to suffer substantial and irreparable harm as a result of the breach.

---

[1] Under Section 10.9, the 2013 Agreement is governed by the laws of the State of Delaware, excluding its conflict of laws rules.

      **1.**     **ShipStation Has Breached the Non-Solicitation Provision in Section 7.7.**

Starting on July 23, 2014, ShipStation used information obtained under the parties' Agreement — namely information about the identity of Endicia's customers who were using the ELS service to print labels — to unilaterally switch over 3600 customers from Endicia to Stamps. The identity of these customers and their information were unquestionably obtained as a result of the Agreement because without the ELS service, these customers could not print USPS labels.

Accordingly, when ShipStation altered the computer applications and unilaterally switched these customers from Endicia to Stamps, ShipStation materially breached the non-solicitation provision. ShipStation's actions were more than solicitation for the benefit of ShipStation and its parent company, Stamps — its actions were outright theft. Delaware law holds that Endicia's outright loss of access to its customers and "danger of losing valuable revenue-generating relationships [are] a harm that may not be compensable in any manner other than injunctive relief." *Zrii, LLC, v. Wellness Acquisition Grp.*, 2009 WL 2998169, at *13 (Del. Ch. Sept. 21, 2009) (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Price*, 1989 WL 108412, at *2–4 (Del. Ch. Sept. 13, 1989)) (granting preliminary injunction).

      **a)**     **ShipStation Customers Who Used Endicia's ELS Service to Print Their Own Shipping Labels Are "Customers of Endicia."**

In response, ShipStation can only offer a distorted interpretation of "Customers of Endicia" that contradicts the plain terms of the 2011 and 2013 Agreements and departs from the parties' three-year course of conduct and contract negotiations. Since the 2011 Agreement to July 23, 2014, ShipStation treated these customers as Endicia's. In fact, in its communications with Express 1 in May, 2014, ShipStation did not limit its definition of Endicia customers as

only those specifically referred by Endicia (as it now attempts to do).[2]  Instead, it defined Stamps customers in that way — and inferred to Express 1 that every other customer who used Express 1 was an Endicia customer.  *See* Emails from Express 1, attached as Ex. T (group exhibit); *see also,* Clark Dep. at 39-43, attached as Ex. C.

Under Delaware law, contract interpretation is a question of law for the court.  *Emmons v. Hartford Underwriters Ins. Co*., 697 A.2d 742, 745 (Del. 1997).  Delaware law also requires that a non-solicitation provision "must be 'read in a way that allows all the language to be read together, reconciling conflicts in the language without rendering any of it nugatory if possible.'" *Commerce Nat'l Ins. v. Buchler*, 120 Fed. App'x 414, 416 (3d Cir. 2004) (citation omitted).  In both the 2011 and 2013 Agreements, "Customer" is defined as an individual who uses Endicia's ELS to print postage labels.  *See,* Exs. A and H 2011 and 2013 Agreements at Recitals and Art. 1.3.

Therefore, reconciling this definition with Section 7.7's non-solicitation provision containing the term "Customers of Endicia," and without rendering either term superfluous, "Customers of Endicia" must mean ShipStation customers who used Endicia's ELS service in a ShipStation application (such as Express 1) to print their own shipping labels with appropriate postage.  In fact, "Customers of Endicia" would be meaningless — as well as the entire non-solicitation clause — if ShipStation customers who used Endicia's ELS were not also considered customers of Endicia.

---

[2]  Under ShipStation's new interpretation of the 2013 Agreement, a "Customer of Endicia" is a customer that Endicia acquired and referred to as ShipStation. Jones Dep. at 132–33, attached as Ex. E.  ShipStation executives pointed to the definition of "Account Referred by Endicia" in the royalty section of the Agreement to support their interpretation.  *Id.* at 133–34, 193–94; Hodges Dep. at 44–47, attached as Ex. L.  However, when asked for an explanation why two different terms (Customer versus Account) with two different contractual obligations (non-solicitation versus royalties) in two separate articles (Article 4 versus Article 7) would mean to same thing, ShipStation's best explanation was that accounts can be read as customers also.  *Id.*

      **b)** **The Plain and Ordinary Meaning of "Customer" Confirms that ShipStation Customers Who Used Endicia's ELS Service to Print Their Own Shipping Labels Are "Customers of Endicia."**

This definition is also consistent with the plain and ordinary meaning of a customer. As courts have held, the plain and ordinary meaning of "customer" is "one that purchases a commodity or service." *Signature Flight Support Corp. v. Landow Aviation Ltd. P'ship*, 698 F. Supp. 2d 602, 617 (E.D. Va. 2010); *Nexen Petroleum U.S.A., Inc. v. Sea Mar Div.*, 2007 WL 2874805, at *2 (E.D. La. Sept. 26, 2007) ("A customer … is 'one who regularly or repeatedly makes purchases of, or has business dealings with, another.'").[3] Here, ShipStation subscribers who used ELS in the applications that ShipStation provides its customers have purchased a commodity and service from Endicia: a shipping label.

      **c)** **Extrinsic Evidence Also Confirms that ShipStation Customers Who Used Endicia's ELS Service to Print Their Own Shipping Labels Are "Customers of Endicia."**

Moreover, if the Court found the term "Customers of Endicia" ambiguous, the Court would reach the same conclusion about its meaning with extrinsic "evidence of prior agreements and communications of the parties as well as trade usage or course of dealing." *Walker Digital, LLC v. Expedia, Inc.*, 950 F. Supp. 2d 729, 735 (D. Del. 2013). Foremost, the parties' course of dealing "is an important source of evidence to which the court should turn. 'The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning.'" *Bd. of Educ. v. Appoquinimink Educ. Ass'n*, 1999 WL 826492, at *4 (Del. Ch. Oct. 6, 1999) (citation omitted). Courts should not deviate from an established course of dealing because the "best extrinsic evidence is what the parties actually did." *Senior Hous. Capital, LLC v. SHP Senior Hous. Fund, LLC*, 2013 WL 1955012, at *41 (Del. Ch. May 13, 2013).

---

[3] *Accord Webster's Third New International Dictionary* 559 (2002) ("one that purchases some commodity or service"); *Black's Law Dictionary* 386 (6th ed. 1990) ("One who regularly or repeatedly makes purchases of, or has business dealings with, a tradesman or business").

Here, ShipStation and Endicia had a course of dealing for three straight years, from July, 2011 to July, 2014. That course of dealing was well-established: (1) ShipStation subscribers who chose Endicia as their shipping provider would use ELS to print their shipping labels; and (2) ShipStation subscribers who used Express 1 to get discounted pricing would use ELS to print their shipping labels. Furthermore, Endicia often handled their customers' issues with Endicia's labels, both directly and in cooperation with ShipStation. *See,* Ex. U. Express 1 also confirmed this course of dealing. There is no evidence that establishes any other course of dealing.

### B. Endicia Is Likely to Succeed on Its Implied Covenant of Good Faith and Fair Dealing Claim.

ShipStation's actions also breached the implied covenant of good faith and fair dealing. The implied covenant imposes "'the obligation to preserve the *spirit* of the bargain rather than the letter, the adherence to *substance* rather than form.'" *Dunlap v. State Farm Fire & Casualty Co.*, 878 A.2d 434, 444 (Del. 2005) (citation omitted).

Contracting parties must "refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain. Thus, parties are liable for breaching the covenant when their conduct frustrates the 'overarching purpose' of the contract by taking advantage of their position to control implementation of the agreement's terms." *Id.* at 442 (citation omitted). To determine whether a defendant's conduct violates the "reasonable expectations" of the plaintiff and therefore violates the implied covenant, courts should "extrapolate the 'spirit' of the contract from its express terms, and 'determine the terms that the parties would have bargained for to govern the dispute had they foreseen the circumstances under which their dispute arose." *PAMI-LEMB 1 Inc. v. EMB-NHC, L.L.C.*, 857 A.2d 998, 1016 (Del. Ch. 2004).

First, ShipStation has breached the implied covenant "to interpret and to act reasonably

upon contractual language that is on its face reasonable." *Chamison v. HealthTrust, Inc*., 735 A.2d 912, 920 (Del. Ch. 1999), *aff'd*, 748 A.2d 407 (Del. 2000).  "This implied covenant is a judicial convention designed to protect the spirit of an agreement when, without violating an express term of the agreement, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties' bargain." *Id.* (breach of the implied covenant through an unreasonable interpretation of a counsel-selection provision); *Keating v. Applus Tech., Inc*., 2009 WL 261091, at *3–4 (E.D. Pa. Feb. 4, 2009) (under Delaware law breach of implied covenant because defendant "[could] not avoid its contractual obligations by creating, in bad faith, an outcome that technically satisfies the [contract], but deprives plaintiffs of their legitimate expectations"); *Homsey v. Vigilant Ins. Co*., 496 F. Supp. 2d 433, 438-40 (D. Del. 2007).  Here, ShipStation is clinging to an unreasonable interpretation of the Agreement and used underhanded tactics when it secretly plotted to, and then switched, over 3,600 customers to Stamps.  Such an unreasonable interpretation is a breach of ShipStation's implied covenant.

Second, ShipStation breached the implied covenant to refrain from self-dealing for its own economic benefit to the detriment of Endicia and not to take advantage of its unique position to control implementation of the Agreement's terms.  *Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*, 749 F. Supp. 2d 1235, 1283-91 (D.N.M. 2010) (Delaware law); *HSMY, Inc. v. Getty Petroleum Mktg.*, 417 F. Supp. 2d 617, 619, 621-22 (D. Del. 2006).  When ShipStation unilaterally switched more than 3,600 customers from Endicia to Stamps, it did so for the financial benefit of its own executives, and to the detriment of its contracting partner.  Indeed, as long as ShipStation persists with its unreasonable interpretation of the Agreement and its ongoing migration of customers to Stamps, Endicia will continue to lose contact with customers and "one cannot know how customers would behave without solicitations from defendant."

*Merrill Lynch*, 1989 WL 108412, at *2–4.

## II.     Endicia Will Be Irreparably Harmed by ShipStation's Misconduct.

Irreparable harm is established here because the parties expressly stipulated to injunctive relief for a breach of Article 7 of the Agreement, including the non-solicitation provision in Section 7.7 and the confidentiality provision in Section 7.1.  Under Delaware law, parties may contractually consent to the irreparable injury requirement.  *True N. Comm'ns, Inc. v. Publicis S.A.*, 711 A.2d 34, 44 (Del. Ch.), *aff'd*, 705 A.2d 244 (Del. 1997); *Potter v. Cmty. Commc'ns Corp.*, 2004 WL 550747, at *3 n.10 (Del. Ch. Mar. 11, 2004).

Moreover, even absent the parties' stipulation, Delaware courts have consistently held that an injunction is an appropriate remedy to enforce proprietary rights over customers.  *Kirpat, Inc. v. Del. Alcoholic Beverage Control Comm'n*, 741 A.2d 356, 358 (Del. 1998) (threatened loss of customers and business is irreparable harm); *Zrii*, 2009 WL 2998169, at *13 ("damage to [plaintiff's] relationships with its distributors and the ensuing loss of customers cannot be calculated accurately"); *Singh v. Balta Envtl. Assocs., Inc.*, 2003 WL 21309115, at *9 (Del. Ch. May 21, 2003) (damages resulting from lost clients "impossible to calculate" and constitute irreparable harm).  As discussed above, ShipStation's migration of customers from Endicia to Stamps has prevented Endicia from having visibility and access to its customers, left these customers guessing why the switch occurred and who was responsible, and thus leaves Endicia exposed to a permanent impairment of its customer base and its reputation.  That harm is irreparable under Delaware law.

## III.     The Balance of the Harm Weighs in Favor of an Injunction.

The harm visited on Endicia here cannot be adequately compensated by damages, and far outweighs any harm to ShipStation by enforcing the status quo pending trial.  Therefore, the balance of the hardships strongly favors Endicia's request for a preliminary injunction.  In fact,

"the 'balance of hardships,' requires no extended discussion [where] . . . it is clear from the record that any harm that the defendants might suffer from a preliminary injunction would be *de minimus*." *Sealy Mattress Co. of New Jersey, Inc. v. Sealy, Inc*., 532 A.2d 1324, 1333 n.16 (Del. Ch. 1987); *accord True North Comm'ns Inc. v. Publicis S.A*., 711 A.2d 34, 45 (Del. Ch. 1997) ("I find that because [defendant] has no right to breach its contract with [plaintiff], [defendant] cannot invoke general equity principles to save it from an injunction.").

Endicia is suffering, and will continue to suffer, irreparable harm if an injunction is not granted pending trial. In contrast, maintaining the status quo that was existed from 2011 to July 22, 2014, would not harm ShipStation and would permit it still to receive payments it received for existing customers under the ShipStation / Express 1 / Endicia course of dealing during the last three years. ShipStation would continue to have all the benefits of the 2013 Agreement.

## IV.     A Preliminary Injunction Will Serve (Not Disserve) the Public Interest.

"[T]he public has an interest in knowing and understanding that agreements between parties will be honored, that contracts will be enforced, and that confidential information and trade secrets will not be disclosed . . . . The public also has an interest in knowing . . . that persons who breach their agreements may not profit or otherwise benefit from such conduct." *Corporate Relocation, Inc. v. Martin*, 2006 WL 4101944, at *18 (N.D. Tex. Sept. 12, 2006); *Daily Instruments Corp. v. Heidt*, 998 F. Supp. 2d 553, 571 (S.D. Tex. 2014) (same).

Here, ShipStation unilaterally diverted more than 3,600 customers — without their knowledge or authorization — from Endicia to Stamps. Granting a preliminary injunction here will advance the policy of protecting the public against deception or confusion and in enforcing contracts among private parties.

## CONCLUSION

For these reasons, Plaintiff PSI Systems, Inc., d/b/a Endicia, respectfully requests that

this Court grant the Application for Preliminary Injunction (ECF No. 6).


Dated:  September 23, 2014                    Respectfully submitted,

                                                       By: /s/ Joseph J. Krasovec, III
                                                           Joseph J. Krasovec, III (admitted *pro hac vice*)
                                                           SCHIFF HARDIN LLP
                                                           6600 Sears Tower
                                                           Chicago, IL 60606
                                                           312-258-5639
                                                           Fax: 312-258-5600
                                                           Email: jkrasovec@schiffhardin.com

                                                           Roy A. Spezia
                                                           GERMER BEAMAN & BROWN
                                                           301 Congress Avenue
                                                           Suite 1700
                                                           Austin, TX 78701
                                                           512-472-0288
                                                           Fax: 512-472-0721
                                                           Email: rspezia@germer-austin.com

                                                           *Attorneys for Plaintiff PSI Systems d/b/a Endicia*

## **CERTIFICATE OF SERVICE**

The undersigned certifies on this 23rd day of September, 2014, that all counsel of record have consented to electronic service and are being served with a copy of this document through the Court's CM/ECF system under Local Rule CV-5(a)(3) and by sending a copy by electronic means to:

M. Craig Tyler
Wilson Sonsini Goodrich & Rosati, PC
900 South Capital of Texas Highway
Las Cimas IV, Fifth Floor
Austin, TX 78746-5546
Tel: (512) 338-5400
Fax: (512) 338-5499
Email: ctyler@wsgr.com
*Attorney for Auctane, LLC d/b/a ShipStation*

/s/ Joseph J. Krasovec, III
Joseph J. Krasovec, III

10808-1537
CH2\15394845.1